UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**14 CV 8564**

------------------------------------x

TESLA WALL SYSTEMS, LLC,

        *Plaintiff,*

- against -

MICHAEL BUDD,

        *Defendant.*

------------------------------------x

Civil Action No. _____

**JUDGE STANTON**

**COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff, Tesla Wall Systems, LLC ("Tesla" or the "Company"), by and through its attorneys, for this Complaint against Defendant Michael Budd hereby alleges as follows:

## INTRODUCTION

1. Tesla brings this action to redress the knowing, intentional and ongoing breach by its former President, Michael Budd ("Budd"), of the confidentiality, non-interference and non-solicitation provisions of his executive Employment Agreement with the Company. Tesla seeks to recover damages resulting from Budd's willful misappropriation of confidential Company information and trade secrets unlawfully taken when he resigned from the Company. Tesla also seeks to recover damages resulting from Budd's breaches of the fiduciary and common law duties owed to Tesla by virtue of his role as President of the Company.

2. As set forth herein, while President of Tesla, Budd misappropriated confidential Company information and trade secrets in order to create a separate company to compete against Tesla in the same line of business and for the same projects. In furtherance of this goal, in May 2014, Budd left Tesla and absconded with Tesla's confidential information, as well as other critical data, information and material necessary for the Company's continuing operation.

1

Despite repeated requests and written demands from Tesla, Budd to date has refused to return the Company's U.S. sales information and other confidential information, all of which was within Budd's exclusive control during his employment with Tesla. As a result, Tesla has lost the ability to pursue ongoing and prospective business opportunities at a great financial loss to the Company, as it no longer has access to information related to, among other things, pending sales in the U.S., project relationships, and engineering work for proposals Budd worked on while President of the Company over the last two (2) years.

3.      Moreover, despite Budd's agreement not to disclose Tesla's confidential information, and to refrain from interfering with Tesla's current and prospective clients or soliciting its employees for a contractually specified time period following his separation of employment from the Company, Budd, upon information and belief, improperly participated in the planning, purchase, staffing and operation of a competing façade business; solicited Tesla employees; and pursued Tesla's customers and corporate opportunities, all in breach of his Employment Agreement and the fiduciary duties he owed the Company.

4.      Upon the facts alleged herein, this Complaint sets forth causes of action for breach of contract, violation of Delaware's Uniform Deceptive Trade Practices Act, misappropriation and conversion of confidential information and breach of fiduciary duty.

## PARTIES

5.      Plaintiff is a limited liability company organized under the laws of the State of Delaware with a principal place of business in Las Vegas, Nevada.

6.      Upon information and belief, Defendant is an individual residing in the state of New York, New York County.

24902385_1

## JURISDICTION AND VENUE

7.     Pursuant to U.S.C. 28 § 1332, this Court has subject-matter jurisdiction over this action because the matter in controversy exceeds the sum of $75,000, exclusive of costs and interest, and there is complete diversity of citizenship between the parties.

8.     Defendant is subject to the personal jurisdiction of this Court, and venue is therefore proper pursuant to 28 U.S.C. § 1391, because Budd is a resident of New York, New York, and all the counts complained of in this Complaint occurred in this jurisdiction.

## FACTUAL ALLEGATIONS

*Tesla and the Building Façade Industry*

9.     Tesla was founded in 2011 and is engaged in the business of designing, engineering and manufacturing building façade systems for use in construction. A building façade system refers to the architectural, non-structural outer cover of a building. Examples include curtain wall, window wall, lobby glass walls, storefront and stone exterior.

10.    Tesla was a market innovator. It successfully incorporated cost-efficient manufacturing in Asia with U.S. engineering and installation that met high U.S. design, quality and schedule standards. A first in the industry, Tesla also developed a method to vertically integrate a highly valuable, but costly, part of the building supply chain—the façade system—into a real estate development company, thus permitting the developer to leverage an untapped line of business at significant cost savings.

11.    Tesla's business methods were the product of a large financial investment by Tesla's owners in both market research and projects that allowed refinement of technical and business processes, acquisition of key employees in Asia and the U.S. and assembly of specific suppliers and fabricators in Asia and the U.S.

12. The Related Companies, L.P. ("Related") is a real estate development company headquartered in New York, New York. On or about November 2012, Related and Tesla formed a strategic partnership whereby Related became Tesla's principal (if not exclusive) customer and its largest supplier of façade work (an estimated $1 billion).

13. There were two components to the strategic partnership between Tesla and Related. First, Related agreed to assist Tesla in obtaining work on significantly-sized commercial projects in order to establish that Tesla's façade system could meet the high U.S. construction standards at reduced costs. Second, after Tesla had established itself, Related agreed to direct its estimated $1 billion worth of façade work to the Company. Prior to Tesla, and typical for U.S. real estate developers, Related did not design, manufacture or install building façade systems or purchase such systems at the price point and quality Tesla offered.

14. The first objective was achieved after Tesla completed a series of high-profile projects for Related: the JFK Airport Terminal 4 in Queens, New York and two (2) high-rise buildings in Chicago, Illinois, one located at 500 North Lake Shore Drive (a 55-story structure), and the other at 111 Wacker Drive (a 65-story structure).

15. The second objective was initiated on or about November 28, 2013 when Related awarded Tesla the façade system contract for the first building (i.e. Building C) of the Hudson Yards Project, a $20 billion development on the west side of Manhattan and one of the largest skyscraper construction projects in the U.S. At the time, Tesla projected the value of the building façade contracts for the Hudson Yards Project to be between $500 and $600 million.

16. On February 7, 2013, due to Chinese aluminum tariff concerns, Related cancelled the award of the Hudson Yards façade system contracts to Tesla.

24902385_1

17. Between April and May 2013, Related re-approached Tesla regarding a potential re-award of the façade contract for Building C.

18. On or about September 2013, Related informed Tesla it was no longer interested in the business of manufacturing and installing façade systems and requested the parties wind down the relationship, but with the understanding Tesla complete active projects for the next year.

### *Budd's Employment Agreement with Tesla*

19. On or about July 2, 2012, Tesla hired Budd to serve, initially, as a consultant for the Company for a period of six (6) months, and thereafter as its President. Budd was responsible for all of Tesla's U.S. operations, including launching the U.S.-based company (e.g. securing benefits packages for all U.S. employees (four (4) in total)), developing new business/sales in the U.S. and managing installation of Tesla products on U.S. projects. Engineering, manufacturing, purchasing, quality control and export operations were located in Asia and managed by other Tesla managers and overseen by Tesla's founder and Chairman.

20. To memorialize the terms of his employment as President, Budd executed an Employment Agreement, dated July 2, 2012. The Employment Agreement is attached hereto as Exhibit A.

21. The Employment Agreement specifies the agreement will be construed and enforced in accordance with the laws of the State of Delaware.

22. Under the Employment Agreement, Budd acknowledged he was being provided access to the Company's "Confidential Information" subject to the various confidentiality provisions contained therein, as a part of his employment. Specifically, on page 5, paragraph B, Budd agreed that:

24902385_1

> You will not use Confidential Information, except for the benefit of the Company in the performance of Your employment duties and responsibilities with the Company. You will not disclose Confidential Information, except for the benefit of the Company and only to individuals authorized by the Company to receive such information.

23. Pursuant to paragraph A of the Employment Agreement, "Confidential Information" includes "any and all confidential and/or propriety knowledge, data, or information of the Company," including but not limited to, "tangible and intangible information relating to … the Company's preparation, design, and construction and installation of curtain walls, … plans for research, new products, marketing and selling, bids, bidding strategy, business plans, budgets and unpublished financial statements, licenses, prices and costs, suppliers and customers … or use of any and all products, materials, systems, concepts or services in any way related to or useful in the business of the Company…."

24. Budd further agreed he would not "copy, abstract, summarize or précis any documents, material or record that contains or refers to the Confidential Information or the Company's property, unless it is for the benefit of the Company and is necessary in [Budd's] fulfillment of [his] employment duties and responsibilities."

25. Budd further agreed that upon termination of his employment he would surrender all property of the Company, and refrain from deleting or altering any information contained upon his Company computers or in his Company notebooks or files prior to returning such to Tesla.

26. Further, pursuant to the non-interference provisions of the Employment Agreement, Budd agreed that during his employment by the Company, he would not:

> [D]irectly or indirectly serve as an officer, director, stockholder, employee, partner, proprietor, investor, joint venturer, associate, representative or consultant of any … other entity whatsoever

6

      known by You to compete with the Company (or is planning or preparing to compete with the Company), anywhere in the world, in any line business engaged in ... by the Company.

27.    In the event of his resignation from the Company, Budd agreed to additional non-interference and non-solicitation obligations:

      [F]or a period of six (6) months after such termination ...You will not interfere with, obstruct or impede, either directly or indirectly, any project on which the Company is working.... Nor will You directly or indirectly, individually or on behalf of a person who is not party to this Agreement ... interfere with or interrupt any business relationship or prospective business relationship of the Company connected to any project on which the Company sought or received information from You in connection with the submission of a bid or in connection with the development of a business relationship or prospective business relationship.

      [F]or a period of nine (9) months after termination ... You will not employ or attempt to employ (by soliciting or assisting anyone else in the solicitation of) any employee of the Company on behalf of any other entity, whether or not such entity competes with the Company.

28.    Budd further acknowledged the necessity for the non-interference and non-solicitation obligations, and Tesla's rights if such obligations were breached:

      The restrictions contained in this Section "Outside Activities and Noninterference and Nonsolicitation Agreement" are necessary for the protection of the business and the goodwill of the Company and are considered by Executive to be reasonable for such purpose and have been reviewed by Your counsel. You agree that any breach of this section will cause the Company substantial and irrevocable damage and, therefore, in the event of any such breach, in addition to such other remedies which may be available, the Company shall have the right to seek specific performance and injunctive relief.

29.    At no point in time prior to his resignation did Budd provide notice of any default by Tesla under the Employment Agreement or provide Tesla with opportunity to cure as required therein.

### *Budd's Misconduct While Employed by Tesla*

30. Upon information and belief, on or around May 2013, while President of Tesla, and unbeknownst to the Company, Budd began to misappropriate Company confidential information and interfere with Company business opportunities by, among other actions, the planning, purchase, staffing and operation of a competing façade business.

31. A key component of Tesla's ongoing business operations was its relationship with Crown Corr, Inc., the contractor that was to install building façade systems for the Company's projects.

32. Upon information and belief, Budd, while President of Tesla, intentionally withheld key information from Tesla and access to Crown Corr. By blocking access to Crown Corr, Budd obstructed and interfered with the Company's contact with its end sales customers and the estimated $150 million worth of jobs Crown Corr and Tesla were jointly bidding at that time.

### *Budd's Resignation from Tesla*

33. On March 8, 2014, Budd served Tesla with a written 60-day notice of his resignation as President, effective May 8, 2014, alleging that because Tesla failed to provide certain benefits under the Agreement his resignation was tendered with "Good Reason." A copy of the notice is attached hereto as Exhibit B.

34. On April 3, 2014, Tesla sent correspondence to Budd detailing the information and data Tesla required Budd to preserve and transfer to the Company prior to his last day of employment on May 8, 2014. A copy of the correspondence is attached hereto as Exhibit C.

35. In its April 3rd letter, Tesla identified the following categories of information that Budd was required to return: (a) a list of all sales contact information; (b) all customer lists

24902385_1